

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00049-CV

CENTERPLACE PROPERTIES, LTD.                                           APPELLANT

V.

COLUMBIA MEDICAL CENTER OF LEWISVILLE SUBSIDIARY, L.P. D/B/A MEDICAL CENTER OF LEWISVILLE AND RAYMOND DUNNING                                           APPELLEES

----------

### FROM THE 367TH DISTRICT COURT OF DENTON COUNTY

----------

## OPINION

----------

### I. Introduction

This is a breach of contract case. Appellant CenterPlace Properties, Ltd. (CenterPlace) appeals an adverse judgment following a bench trial in a suit for breach of a lease agreement that CenterPlace filed against Appellee Columbia

Medical Center of Lewisville Subsidiary, L.P. d/b/a Medical Center of Lewisville (MCL) and Raymond Dunning.[1] The trial court's judgment ordered that CenterPlace take nothing against MCL based upon findings that CenterPlace materially breached the parties' lease agreement and that CenterPlace's breach excused MCL's failure to pay rent after November 1, 2007. The judgment further ordered that CenterPlace pay MCL $34,071.15 in statutory damages and a total of $319,700 in attorneys' fees and costs. CenterPlace contends in four issues, which include several subissues, that the evidence is legally and factually insufficient to support the findings and judgment and that the trial court erred by awarding attorneys' fees to MCL and in failing to award attorneys' fees to CenterPlace. We reverse and render in part and affirm in part.

## II. Background

Ganesh Harpavat, general partner of CenterPlace, formed CenterPlace in 1998 to develop a commercial property complex on three tracts of land that he owned in Flower Mound, Texas. Harpavat's development plan was to construct three medical office buildings referred to as CenterPlace I, CenterPlace II, and

---

[1]Dunning was named as a defendant, individually, in the trial court, having been CEO of MCL at the time the lease was negotiated and executed. He retired in 2005. The final judgment orders that CenterPlace take nothing both as to MCL and Dunning. Although he is named in the style of the case on appeal, CenterPlace has not sought reversal of the take-nothing judgment as to him.

CenterPlace III. CenterPlace I was completed in 1998, and CenterPlace II was completed in 2004.[2]

In 2004, CenterPlace and MCL began negotiations for MCL to lease space in CenterPlace II for an ambulatory surgery center or medical and administrative offices. On November 22, 2004, CenterPlace and MCL entered into a ten-year lease (the lease) covering approximately 17,300 square feet, the entire first floor of CenterPlace II (the premises). At that time, MCL planned to build out the premises for use as an ambulatory surgery facility.

Section 10 of the lease provided that "[t]he parties acknowledge and agree that [MCL] may make alterations and improvements to the interior of the Leased Space in order to prepare the Leased Space for use by [MCL] as medical offices and/or an outpatient surgery facility." Another part of Section 10 required that CenterPlace provide MCL an allowance of $536,200 for tenant improvements (the TI funds) to finish out the premises. CenterPlace was required to provide the TI funds to MCL "on or before the Commencement Date, or if Landlord and Tenant shall agree, in installments as the [w]ork progresse[d]."[3]

Section 10(c) of the lease required that MCL, within thirty days of the lease date, submit to CenterPlace for approval "a space plan which in outline form

---

[2]At the time of trial, construction had not begun on CenterPlace III.

[3]The lease defined "Commencement Date" as the earlier of the date MCL opened for business in the leased space or 180 days from the date the lease was executed by both parties.

shows the layout and configuration of the Leased Space." If CenterPlace did not make any written comments or objections to the space plan within ten days, the lease provided that CenterPlace was "deemed to have approved" the plan. MCL submitted a space plan for an ambulatory surgical center to CenterPlace on December 21, 2004. The parties disagreed at trial as to whether the space plan provided by MCL complied with the lease's terms, but it is undisputed that CenterPlace did not comment about or object to the space plan within ten days.

Although it had provided a space plan to CenterPlace, MCL did not start finishing out the interior of the premises. MCL presented evidence that it did not find adequate physician interest to support its plans for an ambulatory surgery center and that it proposed to move forward immediately with alternate plans for a diagnostic imaging center and a pediatric urgent-care clinic. CenterPlace expressed its disapproval with MCL's alternate plans, particularly regarding the proposed imaging center as possibly competing with an existing tenant, but Harpavat testified that it was very important to him that MCL had represented to him that it was going to proceed immediately. The parties then disputed whether MCL had breached the lease or fraudulently induced CenterPlace into the lease. The parties' dispute evolved into discussions about amending the lease.

On June 28, 2006, CenterPlace and MCL entered into an agreement titled "First Amendment to Lease Agreement" (the amended lease) that altered several provisions of the lease but that also ratified the lease's unchanged provisions. A new paragraph 4 regarding use of the premises was substituted, providing that

4

the premises "may be used for health care and related uses, including but not limited to the operation of an outpatient imaging center, urgent care center, 'after hours' pediatric clinic, sleep lab and/or outpatient ambulatory surgery center, or medical offices." Paragraph 10 of the amended lease granted CenterPlace the right to terminate the lease "upon thirty (30) days['] written notice to [MCL] in the event that the Tenant Improvements, as defined in the Lease, [were] not completed on or before March 15, 2007." Paragraph 10 also provided MCL the alternate option of partially building out the premises so long as the partial build-out "present[ed] the appearance of a fully built out office suite or suites." The amended lease also increased MCL's monthly rent obligation from $21,243.25 to $33,557.59 per month.[4]

In November 2006, MCL provided a plan to CenterPlace for the imaging center and for a partial finish-out and requested the remaining TI funds. But, according to Harpavat, MCL did not commit to a completion date. In December, Beck Construction Company and MCL met with Harpavat regarding the plans for both the partial and complete finish-out. Harpavat approved moving forward by MCL to obtain the building permit from the city, which MCL expected to take four to six weeks, until sometime in January, and Harpavat verbally approved the partial finish-out. However, MCL did not complete (or even start) construction of either the complete or partial finish-out of the premises by March 15, 2007. From

---

[4]The $33,557.59 rent amount was later increased by 2% to $34,071.15 pursuant to section 2(c) of the lease.

January to May 2007, MCL sought an extension of the March 15, 2007 date, and the parties attempted to negotiate another amendment to the lease.

On May 10, 2007, CenterPlace wrote to MCL, stating its position that MCL had defaulted on the lease by failing to timely provide a new space plan and by failing to obtain all necessary government permits, authorizations, and approvals. CenterPlace gave MCL thirty days to cure the alleged defaults. By letter dated June 13, 2007, CenterPlace declared MCL in default of the lease and the amended lease but stated its intention to keep the leases in effect, and CenterPlace demanded payment of accelerated rent of $3,221,397.50 within seven days. CenterPlace warned MCL that it would remove MCL's signs from the premises at MCL's expense if MCL did not do so within fourteen days. In subsequent letters to MCL, CenterPlace continued to require removal of MCL's signs and stated that "[n]o resolution will include [MCL's] future occupation of the premises."[5]

From the inception of the lease, MCL had paid all rent as due, and it continued to pay rent beyond the agreed completion date of March 15, 2007, through October 2007, while the parties tried to negotiate an extended completion date.[6] Negotiations broke down on October 26, 2007, when MCL

_____

[5]It is undisputed that CenterPlace had retained the key to the premises at all times and that MCL had previously gained access to the premises by contacting Harpavat and meeting him at the premises.

[6]MCL paid a total of $1,017,149.48 in rent from the inception of the lease to November 1, 2007.

formally notified CenterPlace that it was terminating the lease and amended lease and would no longer pay rent as of November 1, 2007. CenterPlace filed this lawsuit against MCL in January 2008, alleging causes of action for breach of contract, fraud, and money had and received. MCL denied that it had breached the lease and alleged that CenterPlace had committed prior material breaches of the lease that excused MCL from paying rent. MCL also alleged that CenterPlace had violated Texas Property Code section 93.002 by intentionally preventing MCL from entering the premises.

Trial was to the court over thirteen days, after which the trial court signed a judgment that CenterPlace take nothing on its claims[7] and that awarded MCL $319,700 in attorneys' fees and expenses and $34,071.15 in statutory damages for CenterPlace's violation of property code section 93.002. The trial court also entered original findings of fact and conclusions of law and amended findings of fact. This appeal followed.

### III. Standards of Review

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's

---

[7]The trial court granted MCL's motion for directed verdict as to CenterPlace's fraud claims. CenterPlace has not appealed that ruling.

answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986)

8

(op. on reh'g); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

### IV.  Material Breach of Lease by CenterPlace

The trial court found that MCL breached the lease and amended lease by failing to pay rent after November 1, 2007.  The trial court also found, however, that MCL's breach was excused by CenterPlace's prior breaches of the lease and amended lease before MCL stopped paying rent.  CenterPlace argues in its first issue that the evidence is legally and factually insufficient to support the trial court's findings of material breaches by CenterPlace prior to November 1, 2007.

### A.  Violation of Texas Property Code Section 93.002

CenterPlace argues in the first part of its first issue that there is legally and factually insufficient evidence to support the trial court's findings that CenterPlace breached the lease by intentionally preventing MCL from entering the premises, thereby also violating property code section 93.002(c).  Property code section 93.002(c) states that a commercial landlord "may not intentionally prevent a tenant from entering the leased premises except by judicial process" unless one of three exceptions applies.[8]  *See* Tex. Prop. Code Ann. § 93.002(c) (West 2007).

---

[8]The parties agree that the three exceptions are inapplicable in this case.

**1. Relevant Facts**

On May 10, 2007, CenterPlace gave notice to MCL of alleged default by failing to provide a space plan within thirty days of signing the lease and by failing to obtain all necessary government permits and approvals. CenterPlace advised MCL that it had thirty days to cure the alleged defaults. On June 13, 2007, CenterPlace declared MCL to be in default and made demand that MCL pay $3,213,987.50 in accelerated rent, $7,500 in attorneys' fees, and any additional costs incurred by CenterPlace in reletting the property. The June 13 letter also stated:

> In order to mitigate its damages, CenterPlace will be removing [MCL's] signage from the building. If you have not made arrangements with the undersigned and removed the signage by Wednesday, June 27, 2007[,] CenterPlace shall remove the signage. If CenterPlace removes the signage, any costs incurred in the removal and storage shall be added to CenterPlace's damages claim against [MCL].

On June 14, 2007, CenterPlace's counsel responded by letter to a telephone call and e-mail from MCL's counsel. The June 14, 2007 letter included the following:

> In your email, you ask about CenterPlace's "motives and objectives." CenterPlace wants a tenant that will do what it says it will do. CenterPlace wants a tenant to finish out the premises and move in so as to make the remaining portions of the building viable. In spite of [CenterPlace's] repeated efforts, [MCL] clearly is not such a tenant. Our discussions and negotiations of this year have borne no fruit. CenterPlace carefully considered, but ultimately rejected, [MCL]'s offers to wait yet another year for [MCL] to complete the construction. I am not authorized to negotiate further amendments to the Lease.

10

CenterPlace will seek to replace [MCL] as quickly as possible[,] thereby mitigating its damages. *As [MCL] will not be occupying the premises, its signage must be removed as quickly as possible.* It is difficult to relet the premises with [MCL]'s signage on the building. Again, [MCL] has until Wednesday, June 27, 2007, to make arrangements to remove the signage or CenterPlace will have it removed. All costs incurred shall be added to CenterPlace's damages claim against [MCL].

Please let me know if [MCL] is willing to work with CenterPlace regarding removing the signage and the payment of future rents. [Emphasis added.]

CenterPlace wrote again to MCL on June 21, 2007, declaring that MCL was in default, this time stating in relevant part as follows:

We are willing to have discussions regarding a resolution to the dispute. However, we will not negotiate further amendments to the Lease. <u>No resolution will include [MCL's] future occupation of the premises</u>.

. . . .

[MCL] is in default of the Lease. It does not have any remaining exclusive use rights. <u>Again, [MCL] has not and will not occupy the premises</u>. CenterPlace will be removing the signage and reletting the premises. CenterPlace not only has the right to do so, but it has the obligation to mitigate its damages caused by [MCL]. . . .

Either [MCL] is in default, as we contend; or CenterPlace has a right to unilaterally terminate the Lease, as you contend. *In either case, [MCL] no longer has any right of possession.* Therefore, [MCL] has no basis for the injunction that you have threatened. If you wish to seek such relief, we are willing to accept service, coordinate the date for such a hearing, and delay removing the signage until the matter can be heard. Alternatively, [MCL] can coordinate with CenterPlace to get the premises relet as quickly as possible thereby reducing the damages [MCL] owes to CenterPlace and the waste of litigation.

11

Based upon our conversation, we will refrain from removing the signage until June 29, 2007[,] in order to allow [MCL] time to determine how it would like to proceed. Please let me know your intentions by early next week. [Italicized emphasis added.]

Finally, a July 24, 2007 letter from CenterPlace to MCL stated in part that "[c]ontinued discussion related to [MCL]'s future occupancy" was conditioned on specific terms. The conditional terms were not contained in the lease or the amended lease and, if accepted by MCL, would have among other changes prevented MCL from operating a stand-alone imaging center on the premises and required the removal of MCL's signage at MCL's expense until MCL occupied the premises and leased 60% of the total square footage of CenterPlace II.

## 2. Analysis

CenterPlace argues that even though it at all times maintained the key to the property and sent the June 21 letter advising MCL that it no longer had a right to possession of the property, it did not violate section 93.002(c) because it did not intentionally prevent MCL or any of MCL's representatives from access to the property. CenterPlace points to undisputed evidence that CenterPlace had always possessed the key to the property with MCL's consent, that MCL had never objected or requested a key, that CenterPlace had always allowed MCL access to the property when MCL requested it, that MCL did not request access to the property after it received the June 21 letter, and that CenterPlace never denied MCL access to the property.

12

MCL responds that section 93.002(c) prohibits a landlord from wrongfully excluding a tenant from the property, that the statute does not require a physical act of exclusion before there can be a violation, and that the statute applies to both actual and constructive denials of entry. MCL argues that it had not breached the lease or amended lease as of the June or July 2007 letters and points to the letters from CenterPlace that demanded removal of MCL's signs and unequivocally expressed an intent that MCL no longer occupy the premises as evidence that CenterPlace violated section 93.002(c).

This part of CenterPlace's first issue presents a question of statutory construction.[9] The facts regarding this issue are undisputed. As this court recently stated,

> Issues of statutory construction present questions of law that we review de novo applying well-established rules of construction. *First Am. Title Ins. Co. v. Combs*, 258 S.W.3d 627, 631 (Tex. 2008), *cert. denied*, 129 S. Ct. 2157 (2009). Our primary objective in statutory construction is to give effect to the legislature's intent. *State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). To achieve this, "we look first and foremost to the words of the statute." *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We construe the statute's words according to their plain and common meaning, unless a contrary intention is apparent from the context or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see also* Tex. Gov't

---

[9]MCL contended, and the trial court found, that prior to the time MCL ceased paying rent in November 2007, CenterPlace notified MCL that its right of possession was terminated and that it would no longer be allowed to enter the premises, which notice—under the circumstances of this case—physically excluded MCL from the premises, thus "intentionally prevent[ing]" MCL from entering the premises and constituting both a breach of the lease agreements and a violation of property code section 93.002.

13

Code Ann. § 311.011(a) (West 2005) ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage.").

*Chesser v. LifeCare Mgmt. Servs., L.L.C.*, 356 S.W.3d 613, 619–20 (Tex. App.—Fort Worth 2011, pet. denied). In addition, we consider "the objective the law seeks to obtain and the consequences of a particular construction." *Id.* at 620 (citing Tex. Gov't Code Ann. § 311.023(1), (5) (West 2005)). "In enacting a statute, it is presumed that a just and reasonable result is intended." *Id.* (citing Tex. Gov't Code Ann. § 311.021(3) (West 2005)).

Property code section 93.002(c) prohibits a commercial landlord from "intentionally prevent[ing] a tenant from entering the leased premises." Tex. Prop. Code Ann. § 93.002(c). The trial court could have unquestionably concluded that CenterPlace, through the series of letters to MCL in June and July 2007, expressed its intent that MCL no longer occupy the premises. But CenterPlace's stated intent is not dispositive of whether it violated section 93.002(c) because the statute requires that the landlord intentionally "prevent a tenant from entering the leased premises." *Id.* MCL never requested access to the premises at any time after CenterPlace expressed its intent that MCL no longer occupy the premises. The question, then, is whether section 93.002(c) requires that the landlord take some action beyond making written demands—such as changing the locks or refusing access upon request by the tenant—before it can be found to have intentionally prevented the tenant from entering the premises, or whether a landlord may violate the statute by wrongfully

14

accusing the tenant of breaching the lease and demanding that the tenant vacate the premises.[10]

Only three Texas cases guide our analysis.[11] In *Gluck v. Hadlock*, No. 02-09-00411-CV, 2011 WL 944439, at *2–3 (Tex. App.—Fort Worth Mar. 17, 2011, no pet.) (mem. op.), this court held that legally and factually sufficient evidence supported the jury's finding that a residential landlord had violated property code section 92.0081 by intentionally preventing the tenant from entering the leased premises. We noted the conflicting evidence in the record but held that the evidence was sufficient because the landlord had entered the house without the tenant's permission and had moved the tenant's personal items to the curb before the lease term expired, the landlord had told the tenant before the lease term expired that he would immediately lease the house to someone else, someone had answered the telephone when the tenant called the house before his lease term expired, and the tenant testified that he felt he could not return to the property because someone else was living there. *Id.*

---

[10]The same question—what is meant by "intentionally preventing"—applies both to the trial court's finding that CenterPlace violated section 93.002 and to its separate finding that CenterPlace breached the lease and amended lease by "intentionally preventing" MCL from entering the leased premises.

[11]Two of the three cases address property code section 92.0081, which is the residential-lease version of section 93.002. The two statutes are identical in all material respects for the purposes of this case, and we thus look to interpretations of section 92.0081 to guide our analysis here. *Compare* Tex. Prop. Code Ann. § 92.0081(b) (West Supp. 2012), *with id.* § 93.002(c).

The second case is *Abney Group, Inc. v. Robson*, No. 03-96-00441-CV, 1996 WL 727386 (Tex. App.—Austin Dec. 19, 1996, no writ) (not designated for publication). There, Abney Group was a month-to-month tenant in a warehouse. *Id.* at *1. Abney Group and the landlord negotiated for a higher monthly rent and payment of utilities, but the negotiations were unsuccessful. *Id.* The landlord then advised Abney Group to vacate the premises by August 1, 1995, and Abney Group complied. *Id.* Before that date, however, the landlord changed the locks on the fence surrounding the warehouse and locked the gate on July 25 and 26. *Id.* The landlord did not, however, change the locks to the warehouse office through which Abney could access the warehouse space. *Id.* at *2. Also, one of Abney's employees had a key to the warehouse office at all times. *Id.* The landlord testified that "he slept in the office building on the premises during the two nights in question," that "no one came to the office to request that he open the gate," and that "he would have done so had such a request been made by an Abney representative." *Id.* On that evidence, the court held that an "'actual physical *denial* of a tenant's right of entry' as contemplated by section 93.002(c)(3) of the Property Code" was not conclusively established. *Id.* (quoting *Michaux v. Koebig*, 555 S.W.2d 171, 176 (Tex. Civ. App.—Austin 1977, no writ)).

In *Michaux*, the landlords gave the tenants written notice to vacate for disorderly conduct because the tenants had allegedly failed to follow the landlords' parking policy and had argued with the apartment manager. *See* 555 S.W.2d at 174. The written notice stated, "Because of disorderly conduct in and

16

on a public place, according to Penal Code 4201 . . . you are asked to vacate the premises within three (3) days." *Id.* The tenants peacefully vacated the apartment "in accord with [the] notice from the apartment manager." *Id.* In their suit against the landlords, the tenants alleged that they were "wrongfully excluded from their apartment by an implied threat of criminal complaint." *Id.* at 173.

After quoting the predecessor statute to property code section 92.0081,[12] the court observed that "[t]he purpose of Article 5236c is to deprive landlords of certain self-help devices" and that "Article 5236c is concerned with actual physical denial of a tenant's right of entry, as particularly exemplified by the changing of door locks, or constructive denial of entry or physical use of an apartment by interruption of utility service as prohibited by Article 5236c, sec. (1) (1973)." *Id.* at 176. The court then held,

> In the present case there was no physical exclusion. The landlords' only act was to post on the appellees' door a request that they vacate the premises.
>
> . . . .
>
> The record does not disclose willful exclusion of the tenants from their apartment by the landlord. There was only a written notice of the termination of the residents' rights of occupancy.

---

[12]The predecessor statute stated in relevant part as follows: "It shall be unlawful for a landlord or his agent to willfully exclude a tenant from the tenant's premises in any manner except by judicial process. *Willful exclusion shall mean preventing the tenant from entering into the premises with intent to deprive the tenant of such entry*. . . ." *Id.* at 175 (emphasis added) (quoting Tex. Rev. Civ. Stat. Ann. art. 5236c (1973)).

*Id.*

From these cases, it is evident that Texas law requires a landlord to do something more than post a notice to vacate or send a letter advising the tenant that it no longer has a right to possession before the landlord can be said to have violated property code section 93.002(c). In *Gluck*, the landlord removed the tenant's personal property and relet the premises before the tenant's lease term had expired, thus excluding the tenant from the premises. *See* 2011 WL 944439, at *2–3. In *Abney Group*, the evidence did not conclusively prove a violation of section 93.002 because, even though the landlord had changed the locks to the perimeter fence, Abney Group could have accessed the property through the office but did not request access. *See* 1996 WL 727386, at *2. And in *Michaux*, the court reversed and rendered judgment against the tenants, holding that the landlord's notice to vacate was not an actual physical denial of the tenants' right of entry into the apartment. *See* 555 S.W.2d at 176. The *Michaux* court suggested that physical exclusion through an act such as changing the locks or interrupting utilities is required before a landlord may be found to have violated the statute. *Id.*

As interpreted by those cases, the statute requires that a landlord intentionally take some action to prevent entry, beyond giving a tenant a notice to vacate, before the landlord incurs liability under section 93.002(c). If a notice of default or to vacate were all that the statute required, section 93.002(c) would arguably create landlord liability in each instance in which a landlord even

18

mistakenly believes a tenant has violated the lease and intentionally gives notice to vacate. *See* Tex. Gov't Code Ann. § 311.023(1), (5) (providing that courts may consider the "object sought to be attained" and the "consequences of a particular construction" when construing a statute).

Consistent with the above cases, we hold that some level of landlord self-help beyond a notice of default or to vacate is required to create liability under section 93.002(c). Although CenterPlace had possession of the key at all times, it is undisputed that CenterPlace had always permitted MCL access to the premises when MCL requested it and that MCL did not request access to the premises at any time after CenterPlace sent the June 21 letter. In other words, nothing changed with regard to MCL's ability to enter the premises other than issuance of the demand letters. CenterPlace did not take any action—such as changing the locks, cutting off the utilities, reletting the premises to another tenant, or denying a request from MCL for access to the premises—that actually prevented MCL from entering the premises. The demand letters were legally incorrect and used sharp language, but notices alone are legally insufficient evidence of a section 93.002(c) violation. *See Michaux*, 555 S.W.2d at 176.

Section 93.002(c) prohibits a landlord from "*intentionally prevent[ing] a tenant from entering* the leased premises." *See* Tex. Prop. Code Ann. § 93.002(c) (emphasis added). Considering the statutory language and the judicial interpretations of the statute, the evidence in this case is legally insufficient to support a determination that CenterPlace intentionally prevented MCL from

19

entering the premises. We therefore sustain the first part of CenterPlace's first issue.

## B. Failure to Release Tenant Improvement Funds

CenterPlace contends in the fourth sub-part of its first issue that the evidence is legally and factually insufficient to support the trial court's findings that MCL made a timely request for the TI funds available under the lease and amended lease and that despite repeated requests, CenterPlace refused to release the full amount of the TI funds upon MCL's timely requests as well as the implied finding that CenterPlace's refusal constituted a prior material breach that excused MCL's failure to pay rent after November 1, 2007.

Section 10(e) of the lease states in relevant part,

(e) Upon written notice from Tenant received not later than ninety (90) days following the Lease Date, Landlord shall provide Tenant with an allowance (the "Allowance") to fund the cost of the Tenant Improvements . . . . Tenant shall pay and be responsible for all costs of the Tenant Improvements in excess of the Allowance. *Landlord shall pay the Allowance to Tenant on or before the Commencement Date, or if Landlord and Tenant shall agree, in installments as the Work progresses.* [Italicized emphasis added.]

CenterPlace argues that it was not required to release the TI funds to MCL in one lump sum because "the evidence conclusively shows that MCL requested the funds be paid as work progresses" and because "there is no evidence that CenterPlace 'refused' to release any funds." CenterPlace points to evidence that MCL requested $95,000 in TI funds by letter in February 2005 within 90 days of the lease date and that CenterPlace released those funds as requested.

20

CenterPlace also points to the remainder of the February 2005 letter from MCL, which states, "As to the balance of the funds, we will remain in contact with you as to when and how we would prefer to draw those funds." CenterPlace says that MCL's next request for TI funds was by letter dated December 18, 2006, but that MCL wrote again to CenterPlace within three days on December 21, 2006, stating, "If we do not hear from you on this issue by January 19th, we will accept this as permission to have all invoices sent directly to your attention for payment."[13] Continuing, CenterPlace contends that "[i]t is undisputed that CenterPlace did not object to being invoiced directly" and that MCL never sent CenterPlace an invoice for payment of the remaining TI funds.

MCL counters that MCL made requests throughout November and December 2006 for the release of all remaining TI funds and that CenterPlace refused each request. MCL points to testimony by Douglas Welch, CEO of MCL after Dunning's retirement in mid-2005, that MCL desired to use the TI funds as of November 13, 2006; that MCL sent CenterPlace a letter to that effect on November 13, 2006; and that Harpavat's response to MCL's request for the TI funds was that "[h]e wouldn't allow it." MCL also relies on Harpavat's testimony that Matt Davis, MCL's chief operating officer at the time and in charge of development of the first floor project, stated in that November 13 letter that MCL

---

[13]The preceding sentence in the December 21, 2006 letter states, "Please provide details on how you would like the invoice process for this project to be handled."

expected to use the remaining $441,200 in TI funds for the desired build-out and that Harpavat testified he "probably" declined the partial build-out plans because he did not believe it appropriate to use the TI funds for a partial build-out. MCL further points to Davis's testimony that, as of November 13, MCL expected to use the remaining TI funds as "part of the global budget for this project"; that Harpavat "would continuously say this does not meet the spirit of the first amendment and would not provide approval for anything going forward"; that Harparvat did not provide clarification about the request not meeting the spirit of the amended lease despite Davis's request for clarification; that Harpavat did not respond to MCL's November 13 or December 18 requests for release of the TI funds; that Harpavat also did not respond to Davis's December 20 request for the remaining TI funds; and that MCL had received a letter dated December 29 from CenterPlace's counsel stating that MCL's request for TI funds was "not reasonable." Specifically, the December 29 letter asserted that MCL's proposed partial finish-out "does not rise to the standard of a limited finish out of the Premises" and that "[a]sking [CenterPlace] to pay or consent to the limited construction as satisfaction of the partial performance contemplated by the amended Section 13 is not reasonable."

CenterPlace notes that the December 29 letter ended by stating, "I will await your call or other correspondence," and CenterPlace argues that because MCL never called or otherwise responded to the December 29 letter, the letter is no evidence or factually insufficient evidence that CenterPlace refused to pay the

22

balance of the TI funds in either a lump sum payment or as the work progressed. However, a January 11, 2007 letter from CenterPlace's counsel states that any extension of the March 15, 2007 build-out date must include additional terms not contained in the lease or amended lease, including "[a] stated completion date for construction," "[a] commitment to commence business by a stated date," and "[a]n agreement as to the payment of tenant improvement funds" with the TI funds "payable only upon the commencement of business by the tenant."

We hold that legally and factually sufficient evidence supports the trial court's findings that CenterPlace breached the lease by failing to release the remaining TI funds to MCL. The November 13, December 18, and December 21 letters to CenterPlace, combined with the testimony by Welch, Davis, and Harpavat, establish that MCL had repeatedly requested the release of the remaining TI funds and that Harpavat would not agree to release them. The December 29 letter from CenterPlace's counsel corroborates Harpavat's statements to Davis that the partial build-out, for which MCL desired to use the TI funds, did not meet the "spirit" of the amended lease, and the January 11 letter from CenterPlace's counsel supports a determination that CenterPlace refused to release the remaining TI funds until MCL made further concessions that were not required by the lease or amended lease.[14]

---

[14]The December 29 and January 11 letters also highlight the lack of an agreement between the parties as to how the remaining TI funds would be released, whether by lump sum or by CenterPlace's direct payment of invoices. In the absence of such agreement, the trial court could have reasonably

23

Applying the appropriate standards of review to the two entirely different versions of the facts as testified to and revealed by the written correspondence, we hold that legally and factually sufficient evidence supports the trial court's determination that CenterPlace breached the lease by refusing to release the remaining TI funds to MCL upon request by MCL. *See Cent. Ready Mix Concrete Co.*, 228 S.W.3d at 651; *City of Keller*, 168 S.W.3d at 807, 827; *Pool*, 715 S.W.2d at 635. We thus overrule the fourth part of CenterPlace's first issue.[15]

## V. Attorneys' Fees

CenterPlace argues in its fourth issue that the trial court erred by awarding MCL its attorneys' fees and costs and by concluding that CenterPlace was not entitled to recover its attorneys' fees and costs pursuant to Section 27 of the lease agreement.

### A. Lease Language

Section 27 of the lease states:

In the event any litigation ensues with respect to the rights, duties and obligations of the parties under this Lease, the unsuccessful party in any such action or proceeding shall pay for all costs,

---

concluded that CenterPlace was obligated to release to MCL the remaining TI funds upon MCL's November and December requests.

[15]Because we have overruled the fourth part of CenterPlace's first issue, we need not address the second and third parts of CenterPlace's first issue. *See* Tex. R. App. P. 47.1. We also need not address CenterPlace's second or third issues because those issues are contingent upon CenterPlace's success on the entirety of its first issue.

24

expenses and reasonable attorney's fees incurred by the prevailing party in enforcing the covenants and agreements of this Lease. The term "<u>prevailing party</u>," as used herein, shall mean the party that obtains substantially the relief sought by such party, whether by compromise, settlement or judgment. Further, in the event Landlord retains legal counsel to enforce any of Tenant's obligations hereunder, Tenant shall reimburse Landlord for all reasonable legal fees incurred by Landlord.

## B. MCL as Prevailing Party

CenterPlace first argues that MCL will no longer be the "prevailing party" as defined by the lease if CenterPlace succeeds on its first three issues because, in that event, MCL would not have obtained substantially the relief sought by it in the judgment. We held above, however, that legally and factually sufficient evidence supports the trial court's determination that CenterPlace breached the lease by refusing to release the remaining TI funds to MCL. That breach excused MCL's further payment of rent, a conclusion of law by the trial court of which CenterPlace does not complain. Thus, MCL was and remains the "prevailing party" under Section 27 of the lease because it obtained through the judgment substantially the relief it sought in the lawsuit. *See Johnson v. Smith,* No. 07-10-00017-CV, 2012 WL 140654, at *3 (Tex. App.—Amarillo Jan. 18, 2012, no pet.) (mem. op.); *Silver Lion, Inc. v. Dolphin St., Inc.*, No. 01-07-00370-CV, 2010 WL 2025749, at *18 (Tex. App.—Houston [1st Dist.] May 20, 2010, pet. denied) (mem. op.) (op. on reh'g) (concluding defendant who successfully defended against breach of contract claim was a "prevailing party" under attorneys' fees provision of contract); *see also Fitzgerald v. Schroeder Ventures*

25

*II, LLC,* 345 S.W.3d 624, 629 (Tex. App.—San Antonio 2011, no pet.) (holding defendants who successfully obtained jury findings of no liability resulting in take-nothing judgment in suit relating to contract were each a "prevailing party" entitled to attorneys' fees as provided by contract). We overrule the part of CenterPlace's fourth issue that asserts that the trial court erred by awarding attorneys' fees and costs to MCL based on Section 27 of the lease and MCL's status as the prevailing party in the litigation.[16]

## C. MCL's Recovery Under Property Code Section 93.002

MCL's recovery of attorneys' fees under property code section 93.002 is a different matter. The trial court awarded MCL $37,700 in attorneys' fees for CenterPlace's alleged violation of section 93.002(c), but we held above that legally insufficient evidence supports the trial court's determination that CenterPlace violated property code section 93.002(c). Thus, MCL's attorneys' fees can only be awarded pursuant to the contract and cannot be awarded pursuant to section 93.002(g). *See* Tex. Prop. Code Ann. § 93.002(g)(2) (providing that tenant may recover reasonable attorneys' fees and court costs less any delinquent rents or other sums for which tenant is liable to landlord if landlord or landlord's agent violates that section). MCL did not prevail on its claim under section 93.002(g), nor is it the "prevailing party" under the contract

[16]CenterPlace does not argue that MCL would not be a prevailing party under the lease language in the event we overrule any part of CenterPlace's first three issues.

26

language on its counterclaim for damages based on violation of property code section 93.002. We therefore sustain the part of CenterPlace's fourth issue that challenges the trial court's award of attorneys' fees to MCL based on CenterPlace's alleged violation of section 93.002(c).

## D. CenterPlace's Claim for Attorneys' Fees

CenterPlace argues in the final part of its fourth issue that the trial court erred by failing to award it recovery of its attorneys' fees because the last sentence of Section 27 mandates an award of reasonable attorneys' fees to CenterPlace, even if it is not the prevailing party. In other words, CenterPlace contends that MCL's obligation to pay attorneys' fees to CenterPlace under Section 27 is not contingent upon CenterPlace's litigation success. We are not, however, persuaded that CenterPlace's proposed interpretation of Section 27 is correct.

The interpretation of an unambiguous contract is a question of law that we review de novo. *MCI Telecomms. Corp. v. Tex. Utils. Electric Co.*, 995 S.W.2d 647, 650–51 (Tex. 1999). "Our primary concern in construing a written contract is to ascertain the objective intent of the parties as expressed in the contract." *DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 178 (Tex. App.—Fort Worth 2012, no pet.) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dism'd)). "We examine and consider the entire document in an effort to harmonize and give effect to all provisions of the

27

contract so that none will be rendered meaningless." *Id.* (citing *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex. 2006); *Coker*, 650 S.W.2d at 393; *City of the Colony*, 272 S.W.3d at 722); *see El Paso Field Servs., L.P. v. MasTech N. Am., Inc.*, 389 S.W.3d 802, 805 (Tex. 2012). "When the provisions of a contract appear to conflict, they should be harmonized if possible to reflect the intentions of the parties." *Ogden v. Dickinson State Bank*, 662 S.W.2d 330, 332 (Tex. 1983) (op. on reh'g) (citing *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1979)). "Generally, the parties to a contract intend every clause to have some effect[,] and the Court will not strike down any portion of the contract unless there is an irreconcilable conflict." *Id.* (citing *Woods v. Sims*, 154 Tex. 59, 64, 273 S.W.2d 617, 620 (1954)).

The first two sentences of Section 27 provide for the mandatory award of attorneys' fees to the prevailing party if litigation ensues relating to the lease. MCL, as stated above, is the prevailing party entitled to recover its costs and attorneys' fees under that portion of Section 27. But in arguing that it should also be awarded its attorneys' fees, CenterPlace relies on the last sentence of Section 27, which states, "Further, in the event Landlord retains legal counsel to enforce any of Tenant's obligations hereunder, Tenant shall reimburse Landlord for all reasonable legal fees incurred by Landlord."

CenterPlace, even though it is not a prevailing party, argues that it is entitled to recover its attorneys' fees because the last sentence of Section 27 does not require that CenterPlace prevail, only that CenterPlace retain legal

28

counsel to enforce MCL's lease obligations. But CenterPlace is asking that we ignore the first two sentences of Section 27 and read the last sentence in isolation. This we cannot do because we must consider the entire document in order to give each provision meaning if possible. *See DaimlerChrysler Motors Co.*, 362 S.W.3d at 178. Giving effect to all parts of Section 27, it seems clear that the parties intended that CenterPlace would be entitled to reimbursement of its reasonable legal fees if CenterPlace retained counsel to enforce MCL's obligations under the lease agreements so long as litigation did not ensue. But if litigation ensued, only the prevailing party in the litigation would be entitled to recover its attorneys' fees. That the parties intended the last sentence of Section 27 to apply in the absence of litigation and for the first two sentences to apply in the event of litigation is confirmed by the parties' use of "[f]urther" as an introduction to the last sentence and "[i]n the event any litigation ensues" as an introduction to the first sentence. *See generally Gen. Fin. Servs., Inc. v. Practice Place, Inc.*, 897 S.W.2d 516, 522 (Tex. App.—Fort Worth 1995, no writ) ("The language of a contract should be given its plain, ordinary, and commonly accepted meaning. Courts are required to follow elemental rules of grammar for a reasonable application of the legal rules of construction." (citations omitted)). The use of "[f]urther" as an introduction to the last sentence of Section 27 suggests that the last sentence applies only to a circumstance different than the first two sentences of Section 27. And the introductory "[i]n the event any litigation ensues" language in the first sentence of Section 27, particularly

29

compared to the more general language used in the last sentence of Section 27, suggests that the parties intended for only the first two sentences to apply once the parties' dispute led to litigation, and the first two sentences permit only the prevailing party in the litigation to recover its costs and attorneys' fees. MCL is the prevailing party and is thus the only party entitled to recover its costs and attorneys' fees. Had CenterPlace prevailed in the litigation, then only CenterPlace would have been entitled to recover its costs and attorneys' fees. Contrary to CenterPlace's contention, the only reasonable manner in which to construe Section 27 to give effect to all three sentences is to interpret it to mean that CenterPlace would have been entitled to recover its attorneys' fees if the parties' dispute had not resulted in litigation but that because "litigation ensue[d]" from the parties' dispute, only MCL is permitted to recover its costs and attorneys' fees as the prevailing party. We therefore hold that the trial court did not err by refusing to award CenterPlace its attorneys' fees under Section 27 of the lease. Accordingly, we overrule the remainder of CenterPlace's fourth issue.

## VI. Conclusion

Having sustained the first part of CenterPlace's first issue and part of its fourth issue, and having overruled the remainder of CenterPlace's dispositive issues, we reverse the portions of the trial court's judgment relating to MCL's claim for statutory damages and attorneys' fees under property code section 93.002. We render judgment that MCL take nothing on its property code section 93.002 claim. We affirm the remainder of the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL:  GARDNER, WALKER, and MEIER, JJ.

DELIVERED:  May 30, 2013

31